IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. SHAW


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

WESTON D. SHAW, APPELLANT.


Filed December 10, 2019.    No. A-18-792.


Appeal from the District Court for Lancaster County, JODI L. NELSON, Judge, on appeal thereto from the County Court for Lancaster County, TIMOTHY C. PHILLIPS, Judge. Judgment of District Court affirmed.

Joe Nigro, Lancaster County Public Defender, and Chelsie Krell for appellant.

Marcee A. Brownlee, Assistant Lincoln City Prosecutor, for appellee.


PIRTLE, RIEDMANN, and WELCH, Judges.

PIRTLE, Judge.

## INTRODUCTION

Weston D. Shaw appeals from an order of the district court for Lancaster County, which affirmed the Lancaster County Court's order finding him guilty of driving under the influence (DUI), second offense, and operating a motor vehicle with a suspended license. He argues that the evidence was insufficient to find him guilty of DUI and operating a motor vehicle with a suspended license because the State failed to prove that he was operating or in actual physical control of the vehicle. Based on the reasons that follow, we affirm.

## BACKGROUND

On March 16, 2017, at approximately 11:40 p.m., Lincoln Police Officer Kiefer Hyland began following a truck. As a matter of routine, Hyland ran a check of the vehicle's license plate.

Before the registration check was complete, Hyland observed the truck turn into an apartment complex parking lot. Hyland continued driving in the same direction. He then received the results of the license plate check which showed that the registration for the truck he had been following was not current and that the registered owner of the vehicle, Shaw, had an active warrant for his arrest. After receiving the information about the truck and its owner, Hyland entered the same parking lot the truck had entered, but at a different entrance. Hyland testified he lost sight of the truck for about 45 seconds between the time that the truck turned into the parking lot and that he turned into the parking lot.

Hyland located the truck in the parking lot and made contact with Shaw, who was sitting in the driver's seat. The truck was parked, and the engine was not running. The keys were not in the ignition of the truck and were not on Shaw's person. Hyland testified that Shaw had bloodshot eyes, slurred speech, and an odor of alcohol on his breath. Hyland also noticed an open container of beer in the center console cup holder. An individual identified as Wade Taft was seated in the front passenger seat of the pickup. Hyland testified that Taft appeared intoxicated but not "extremely" intoxicated.

Shaw told Hyland that his friend Dan had been driving the truck and that he was just sitting in the driver's seat waiting for Dan to come back. Hyland testified that Shaw stated he did not know why Dan had pulled into the parking lot or where Dan had gone. Hyland instructed Shaw to step out of the vehicle and proceeded to arrest him for the outstanding warrant. Hyland then searched the interior of the truck and found a bottle of vodka and a steel cup containing a liquid that Hyland testified smelled like vodka mixed with something sweet. The cup was located in one of the center console cup holders, next to the can of beer. Hyland testified that the keys to the truck were later found by another officer in the bed of the truck.

Hyland transported Shaw to the jail where he administered a test to measure Shaw's blood alcohol content. The test result showed that Shaw's blood alcohol content was 0.124 of a gram of alcohol per 210 liters of breath.

On March 21, 2017, the State filed a complaint in the Lancaster County Court charging Shaw with the municipal offenses of DUI of alcoholic liquor or drug, operating a motor vehicle with a suspended license, making a false statement to a police officer, having an open container of alcohol in a motor vehicle, and improper vehicle registration. Shaw pled not guilty to all the charges in the complaint.

A bench trial was held on the charges. Hyland testified as set forth above. He further testified that he never visually observed the driver of the truck when he was following it. He also testified that he did not see the truck when it was being parked in the lot and could not have seen if anyone got out of the driver's seat and/or if anyone moved into the driver's seat.

Sergeant Jake Dilsaver testified that he arrived at the scene a few minutes after Hyland initiated the traffic stop. Dilsaver testified that he noticed the odor of alcohol on Taft and Taft admitted that he had consumed alcohol, but Dilsaver did not observe any apparent signs of intoxication. Dilsaver even had a conversation with Taft about whether he would be comfortable driving Shaw's truck home and would not have done so if he was concerned about Taft's level of impairment. Dilsaver also noted that the keys to the truck were found in the truck bed and that the back window to the truck was open.

Taft testified that on March 16, 2017, he had been at Shaw's house with John Youngblood and that the three of them went to "Madsen's" to play pool. Taft testified that Youngblood drove the three of them in Shaw's truck and that their friend, Dan Bohling, met them at Madsen's. Around 10:30 or 11 p.m., Shaw, Taft, and Youngblood left Madsen's in Shaw's truck and headed to Chris Smith's house. Taft testified that Youngblood was driving, he was in the passenger seat, and Shaw was in the back seat. Taft remembered being at Smith's apartment, but testified that he became too intoxicated to remember the rest of the evening, including leaving Smith's apartment, going to the apartment complex parking lot, being contacted by the police, and getting home that night. He also stated that he did not recall who was in Shaw's truck or who was driving when they left Smith's apartment.

Smith testified that Shaw, Taft, Youngblood, and Bohling were at his house on March 16, 2017. Smith testified that Taft became intoxicated while at his apartment. Smith testified that when Shaw, Taft, and Youngblood left his residence, he saw Youngblood driving Shaw's truck. He testified that Taft got in the passenger seat and Shaw got in the backseat.

Youngblood testified that he was driving Shaw's truck on March 16, 2017. Specifically, Youngblood testified that he drove Shaw's truck from Shaw's house to Madsen's, from Madsen's to Smith's house, and from Smith's house to the parking lot of the apartment complex. He testified that when he, Shaw, and Taft left Smith's house, Taft was in the passenger seat and Shaw was in the backseat. Youngblood testified that no one named Dan drove the pickup or was in the pickup during the drive from Smith's house to the apartment parking lot.

Youngblood testified that he drove into the parking lot because his girlfriend lived at the apartment complex and he wanted to talk to her. Youngblood testified that when he exited the truck, he threw the keys into the bed of the truck because he did not want them in his pocket. On cross-examination, he testified that he threw the keys in the truck bed to prevent Shaw from driving away, because Shaw "likes to drive with a heavy foot" and he had a DUI conviction in the past. Youngblood testified that when he came out of his girlfriend's apartment building, he saw the police officers contacting Shaw and Taft. Youngblood testified that he walked away instead of returning to the vehicle because he had a pending marijuana charge against him and did not want to interact with the police.

Shaw testified that Taft and Youngblood came over to his house and then they went to Madsen's to shoot pool. Shaw testified that Youngblood drove his truck to Madsen's. The three of them then went to Smith's apartment and from there they were going to go back to Shaw's house, but Youngblood wanted to first stop at his girlfriend's apartment. Shaw testified that Youngblood parked the truck in the apartment complex parking lot and got out, stating he would be right back. Shaw testified that he then got into the driver's seat to talk with Taft and then the police arrived. Shaw testified that he assumed Youngblood had the keys with him when he got out of the pickup. Shaw admitted that he had intentionally lied to Hyland when he stated that his friend Dan had been driving the pickup. Shaw testified he lied to protect Youngblood because Youngblood was facing a charge and had been drinking that night and Shaw did not want him to get in trouble.

Following the bench trial, the county court found Shaw guilty on all charges. Following an enhancement hearing and sentencing hearing, the court found Shaw guilty of DUI, second offense, and sentenced him on all the charges. Shaw appealed to the district court, arguing that the county

court erred in finding sufficient evidence to convict him of DUI and operating a motor vehicle with a suspended license.

The district court entered an order finding that a rational trier of fact could have found Shaw guilty of DUI and operating a motor vehicle with a suspended license, and affirmed the county court's order.

## ASSIGNMENT OF ERROR

Shaw assigns that the district court erred in affirming his county court convictions for DUI, second offense, and operating a motor vehicle with a suspended license.

## STANDARD OF REVIEW

In an appeal of a criminal case from the county court, the district court acts as an intermediate court of appeals, and its review is limited to an examination of the record for error or abuse of discretion. *State v. Avey*, 288 Neb. 233, 846 N.W.2d 662 (2014). Both the district court and a higher appellate court generally review appeals from the county court for error appearing on the record. *Id.* When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id.* When deciding appeals from criminal convictions in county court, we apply the same standards of review that we apply to decide appeals from criminal convictions in district court. *Id.*

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Gonzales*, 294 Neb. 627, 884 N.W.2d 102 (2016). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

## ANALYSIS

Shaw assigns that the district court erred in affirming his county court convictions for DUI and operating a motor vehicle with a suspended license because the evidence at trial was insufficient to find him guilty of these charges. Specifically, he argues that the State failed to prove he was operating or in actual physical control of the truck. We will address the sufficiency of the evidence for the two convictions separately.

*DUI.*

Shaw was charged with DUI under Lincoln's ordinance which states: "It shall be unlawful for any person *to operate or be in the actual physical control* of any motor vehicle while under the influence of alcoholic liquor, or of any drug. . . ." Lincoln Municipal Code § 10.16.030 (emphasis supplied). He does not challenge the finding that he was under the influence of alcoholic liquor or of any drug, so we need not address that element of the crime. Rather, we focus our analysis on whether there was sufficient evidence to prove that Shaw operated or was in actual physical control of the truck.

We note that the Lincoln DUI ordinance contains the same language as Neb. Rev. Stat. § 60-6,196 (Reissue 2010), Nebraska's DUI statute. Therefore, we find case law pertaining to § 60-6,196 to be applicable in determining whether the evidence was sufficient to prove that Shaw operated or was in the actual physical control of the truck.

When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Juranek*, 287 Neb. 846, 844 N.W.2d 791 (2014). In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. *Id.*

In DUI cases, circumstantial evidence can establish a person's operation of a motor vehicle. *State v. Matit*, 288 Neb. 163, 846 N.W.2d 232 (2014). We conclude that there is sufficient circumstantial evidence to show that Shaw was driving or operating the truck on the night in question. The evidence showed that the truck belonged to Shaw. When Hyland approached the truck in the parking lot, Shaw was in the driver's seat. Shaw admittedly lied to Hyland, telling him that his friend Dan drove the truck to the parking lot. This demonstrates Shaw's lack of credibility. Shaw testified that Youngblood was the actual driver on the night at issue, and Shaw claimed that he moved from the back seat of the truck to the driver's seat after Youngblood got out. However, Hyland testified that he only lost sight of the truck for 45 seconds when it turned into the parking lot. In the 45 seconds after losing sight of the moving truck, Hyland found Shaw in the driver's seat. Further, based on the witnesses' testimony, during the 45 seconds that the truck was out of Hyland's sight, Youngblood parked the truck, got out of the vehicle, and threw the keys in the bed of the truck, and Shaw moved from the back to the front seat of the truck without Hyland seeing any of this.

Taft testified that he became intoxicated at Smith's apartment and did not remember leaving Smith's apartment, going to the apartment complex parking lot, being contacted by the police, or getting home that night. He also stated that he did not recall who was in Shaw's truck or who was driving when they left Smith's apartment. However, Dilsaver testified that he did not believe Taft was intoxicated when he spoke with him at the scene and even asked him if he would be comfortable driving Shaw's truck home. Dilsaver testified that he would not have asked him to drive if he was concerned about Taft's level of impairment.

In addition, Youngblood provided inconsistent testimony about why he threw the keys in the bed of the truck. He first testified he threw the keys into the bed of the truck because he did not want them in his pocket. On cross-examination, however, he testified that he threw the keys in the truck bed to prevent Shaw from driving away because Shaw "likes to drive with a heavy foot" and he had a DUI conviction in the past. Dilsaver also testified that the back window to the truck was open, which would have allowed Shaw to throw the keys into the truck bed.

Viewing the evidence in a light most favorable to the State, we conclude that a rational trier of fact could have found Shaw was the individual operating the truck and thus found the essential elements of the crime beyond a reasonable doubt. Therefore, the district court did not err in affirming Shaw's conviction for DUI in county court.

*Operating Motor Vehicle With Suspended License.*

Shaw also challenges the sufficiency of the evidence for the operating a motor vehicle with a suspended license conviction, again arguing that the State failed to prove he was operating the truck. Lincoln Municipal Code § 10.16.065 makes it unlawful for any person "to operate a motor vehicle within the City . . . (ii) after a period of revocation but before issuance of a new license." Shaw does not dispute that his license was suspended. Having determined that there was sufficient evidence to support a finding that Shaw was operating the truck, a rational trier of fact could have found the essential elements of operating a motor vehicle with a suspended license beyond a reasonable doubt. Accordingly, Shaw's conviction and sentence for operating a motor vehicle with a suspended license is affirmed.

## CONCLUSION

We conclude that there was sufficient evidence to sustain Shaw's conviction for DUI, second offense, and operating a motor vehicle with a suspended license. Accordingly, the district court's order is affirmed.

AFFIRMED.